Filed 9/15/22  P. v. Ramirez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077949 |
| v. | (Super. Ct. No. FSB056120) |
| OMAR RAMIREZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Bryan Foster, Judge.  Affirmed.

Kiana Sloan-Hillier, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

1

I.

INTRODUCTION

Defendant and appellant Omar Ramirez (Omar) appeals the trial court's summary denial of his petition for resentencing pursuant to Penal Code section 1170.95.[1] He argues the trial court erred in denying his petition without issuing an order to show cause and holding an evidentiary hearing because he averred to facts rendered him eligible for resentencing and the record does not indisputably show he is ineligible. The record of conviction shows Omar is ineligible for resentencing as a matter of law. We therefore affirm the court's order.

II.

FACTUAL AND PROCEDURAL BACKGROUND[2]

During an encounter at a bar in 2006, Omar and his brother, codefendant Jonathan Julian Ramirez (Jonathan) attacked and killed Enrique Bermudez (Bermudez), a 72-year-old man who had asked them to be more respectful to their stepfather who was with them at the bar. Defendants fled to Mexico the next day. After some years, they were extradited and returned to the United States to stand trial in 2010.

---

[1] That section has since been renumbered as Penal Code section 1172.6. (Stats. 2022, ch. 58, § 10.) However, because that change was nonsubstantive and it occurred after briefing in this case was complete, we will cite to Penal Code section 1170.95 for ease of reference. All further statutory references are to the Penal Code.

[2] The factual background is taken from this court's nonpublished opinion in defendant's prior appeal, case No. E051155, which is part of the record on appeal in this case. (*People v. Ramirez* (Nov. 7, 2011, E051155) [nonpub. opn.] (*Ramirez I*).)

2

The facts at trial showed as follows: Bermudez was a regular patron of the La Veranda bar and restaurant. He often came for company and conversation. The assistant manager described Bermudez as acting like a father toward the employees and assisting them in various ways.

The subject events occurred on the evening of Friday, May 12, 2006, and after midnight at approximately 1:00 a.m. on Saturday, May 13, 2006,[3] when Bermudez and defendants were all in the bar section of the restaurant.

Manuel Cabrera Gutierrez (Cabrera) testified that Bermudez initiated a conversation with him at the bar. Bermudez said he was not drinking alcohol. Cabrera thought he was drinking orange juice.

While Cabrera and Bermudez were talking, defendants and their stepfather entered the bar with two women. After a while, the women left. The three men talked with one another and bought a round of beers for everyone.

Things were friendly until Bermudez became upset because he thought defendants were behaving disrespectfully and using profanity toward their stepfather. He told Cabrera he intended to reprove defendants. After the stepfather left the bar, Bermudez approached defendants and Cabrera heard him say, "I believe you guys—you're offending the old man that left, and I don't find it right."

Jonathan, the heavier of the two defendants, stood and shoved Bermudez. Bermudez fell backwards. Cabrera tried to stop Jonathan and told him it was not a fair

_____

[3] Mother's Day was Sunday, May 14, 2006.

3

fight because Bermudez was so much older. Omar approached Cabrera from behind and tried to strike him but Cabrera dodged the blow. Cabrera released his hold on Jonathan and grabbed Omar.

According to Cabrera, Jonathan began punching and kicking Bermudez in the head and upper body as he lay on the floor. Cabrera was shocked and released Omar. Omar grabbed a bar stool and began striking Bermudez in the face and stomach. Meanwhile, Jonathan provoked a fight with Ruben Ramirez (Ruben), another patron. Omar then threw a bar stool at Ruben.

According to Ruben, when he told defendants to stop hitting Bermudez, Omar responded, "you want some too." Omar attacked Ruben, hitting Ruben in the head with his hands and feet. The paramedics revived Ruben on the floor of the bar.

The assistant manager recalled Bermudez was eating dinner and drinking Bud Light beer earlier in the evening. While Bermudez was in the bar area and defendants were "talking bad," Bermudez asked them not to use such language in the presence of ladies. A second time he asked them not to be so loud and they started talking back at him angrily.

After the stepfather left, Jonathan began shoving Bermudez. The assistant manager tried to intervene and she told a waitress to call 911. She also asked the other bar patrons to help. Jonathan was hitting Bermudez and almost hitting the assistant manager. Then Jonathan straddled Bermudez on the ground and punched him. Bermudez tried to fend off the blows with his hands. Omar was fighting with Ruben.

4

Both defendants hit Bermudez with bar stools for more than 20 minutes. The assistant manager followed defendants outside and yelled that they had killed Bermudez.

Defendants' mother testified that defendants lived with her. Because she did not permit alcohol in her house, she drove defendants and her husband to La Veranda at 10:00 p.m. on Friday night so they could drink. Defendants were already drunk when they arrived at the bar. Defendants' mother did not enter the bar because she was wearing pajamas. She dropped the men off and went home. She returned about 1:00 a.m. and went inside looking for them, accompanied by Jonathan's girlfriend.

In the bar, people were singing and dancing. Defendants' mother asked the waitress not to serve defendants any more alcohol. Then defendants' mother got mad and went outside. Shortly after she left, defendants' stepfather joined her outside and got in the car. Defendants followed and said, "Let's go, they are fighting." A woman emerged screaming in Spanish and yelling on a phone.

Defendants and their mother and stepfather went home. Defendants' stepfather was very drunk and falling down. Defendants were also drunk and their mother told them to leave the house that evening. She did not see any blood on them and she did not see or talk to her sons for two years after that night.

Defendants' stepfather testified that he remembered nothing about the events of May 12 and 13, 2006. He did not remember telling a police officer that he was at La Veranda but he did not want to get involved in a fight. He also did not recall saying that

5

Jonathan and Omar had beaten him up when they returned home and their mother kicked them out of the house.

On May 13, 2006, defendants called their cousin to say their van had broken down in Los Angeles. She went to meet them at the Los Angeles location that afternoon and they asked her to get rid of the van for them. They removed some bags from the van and walked away down the street.

Bermudez died from multiple blunt force injuries. His injuries included a broken jaw, nose and ribs, multiple lacerations, loose teeth, and hemorrhaging around the eyes, scalp, brain, neck, and torso.

A jury convicted each defendant of one count of first degree murder (§ 187, subd. (a)) against Bermudez and one count of assault by means likely to produce great bodily injury (§ 245, subd. (a)(1)) against Ruben, who tried to intervene during defendants' attack. The trial court sentenced both defendants to prison terms of four years plus 25 years to life.

Omar subsequently appealed, arguing seven issues involving sufficiency of evidence for first degree murder, aider and abettor liability, instructional error, prosecutorial error, and custody credits. We rejected Omar's contentions, affirmed the judgment, and remanded the matter to allow the trial court to recalculate custody credits. (See *Ramirez I*, *supra*, E051155.)

On January 25, 2021, Omar, represented by counsel, filed a petition for resentencing under Senate Bill No. 1437 and section 1170.95. The People filed an

opposition to the petition, arguing no order to show cause should be issued and the petition should be denied because Omar was not eligible for relief on the grounds that Omar was one of the two persons who personally assaulted and killed Bermudez.

A hearing on the petition was held on October 7, 2021. Following argument, the trial court denied the petition, finding Omar was ineligible as a matter of law because he was a joint participant in the killing of Bermudez. The court noted that Omar and his brother acted in joint concert and that they both used a barstool to beat Bermudez to death. Omar timely appealed.

## III.

## DISCUSSION

Omar contends the trial court erred in summarily denying his petition for resentencing without issuing an order to show cause and conducting an evidentiary hearing because he averred to facts, which if true, rendered him eligible for resentencing. He claims he is entitled to a hearing based on the police report and a declaration from his brother, which were attached to his petition.[4] He further believes that the prosecution proceeded under the natural and probable consequences doctrine to prove the first degree murder conviction. We conclude that the trial court did not err in denying the petition after finding defendant is not eligible for relief under section 1170.95.

---

[4] Jonathan's declaration indicates that Jonathan took responsibility for using the bar stool as a weapon during the fight and that Omar was not involved in the beating of the victim.

7

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 to "'amend[] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*); see Stats. 2018, ch. 1015, § 1, subd. (f).) The criminal liability of direct aiders and abettors did not change under Senate Bill No. 1437. (*People v. Offley* (2020) 48 Cal.App.5th 588, 595-596.)

Senate Bill No. 1437 eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and significantly limited the scope of the felony-murder rule. (*People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*); *Gentile*, *supra*, 10 Cal.5th at pp. 842-843, 847-848.) As relevant here, under the natural and probable consequences doctrine, a person who knowingly aided and abetted a crime, the natural and probable consequence of which was murder, could be convicted of not only the target crime but also of the resulting murder, irrespective of whether he or she harbored malice aforethought. (*Gentile*, *supra*, at pp. 843-845; *People v. Offley*, *supra*, 48 Cal.App.5th at p. 595.) However, Senate Bill No. 1437 amended section 188 to provide that "[e]xcept as stated in subdivision (e) of [s]ection 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3); Stats. 2018, ch. 1015, § 2.) "Senate Bill No. 1437 changed the circumstances under which a person could

be convicted of murder without a showing of malice, but it did not exclude from liability persons convicted of murder for acting with implied malice." (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1057, abrogated on another ground by *Lewis*, *supra*, 11 Cal.5th at p. 967.)

Senate Bill No. 1437 also "added section 1170.95 to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief." (*Gentile*, *supra*, 10 Cal.5th at p. 843; see *Lewis*, *supra*, 11 Cal.5th at p. 959.) Pursuant to section 1170.95, an offender must file a petition in the sentencing court declaring that: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine . . . [;] [¶] (2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder [;] [¶] [and] (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1170.95, subds. (a)(1)-(3); see § 1170.95 subd. (b)(1)(A).)

The trial court then determines whether the petition is facially sufficient under section 1170.95, subdivision (b). (*Lewis*, *supra*, 11 Cal.5th at p. 960.) If the section 1170.95 petition contains all the required information, including a declaration by the petitioner that he or she was convicted of murder and could not now be convicted of

9

murder because of changes to section 188 or 189 (§ 1170.95, subd. (b)(1)(A)), the court then must appoint counsel to represent the petitioner upon his or her request pursuant to section 1170.95, subdivision (c). (*Lewis*, *supra*, at pp. 957, 959-960, 966.) Further, upon the filing of a facially sufficient petition, the court must direct the prosecutor to file a response to the petition and permit the petitioner to file a reply, and the court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (See § 1170.95, subd. (c); *Lewis*, *supra*, at pp. 964, 966.)

In determining whether the petitioner has made a prima facie showing, "'"the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause."' [Citation.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citation.]" (*Lewis*, *supra*, 11 Cal.5th at p. 971.) "In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'" (*Id*. at p. 972.) "[T]he trial court should not decide unresolved factual issues that involve credibility determinations or weighing of evidence. Rather, it should decide such issues only after issuing an order to show cause and holding an evidentiary hearing." (*People v. Duchine* (2021) 60 Cal.App.5th 798, 811-812, fn. omitted.)

"Nevertheless, the court may appropriately deny a petition at the prima facie stage if the petitioner is ineligible for relief *as a matter of law*." (*People v. Harden* (2022) 76

Cal.App.5th 262, 270 (*Harden*).) "'"[I]f the record, including the court's own documents, 'contain[s] facts refuting the allegations made in the petition,' then 'the court is justified in making a credibility determination adverse to the petitioner,'"'" thereby deeming him or her ineligible. (*Lewis*, *supra*, 11 Cal.5th at p. 971.) For example, if the record shows that the jury was not instructed on either the natural and probable consequences or felony-murder doctrines, then the petitioner is ineligible for relief as a matter of law. [Citation.] A finding of ineligibility at the prima facie stage may also be based on a legal holding from a prior appellate opinion arising from the conviction. [Citation.]" (*People v. Harden*, *supra*, at p. 270, citing *People v. Daniel* (2020) 57 Cal.App.5th 666, 677 & *Lewis*, *supra*, at p. 972.)

If the petitioner makes a prima facie showing under section 1170.95, subdivision (c), the court must issue an order to show cause and hold a hearing "to determine whether to vacate the murder . . . conviction and to recall the sentence and resentence the petitioner on any remaining counts." (§ 1170.95, subd. (d)(1).) If a hearing is held, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (d)(3).) The prosecutor and the petitioner may offer new or additional evidence to meet their respective burdens at the hearing stage. The admission of evidence at the hearing is governed by the Evidence Code. However, the court also "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law,

11

including witness testimony, stipulated evidence, and matters judicially noticed," as well as the "procedural history of the case recited in any prior appellate opinion." (§ 1170.95, subd. (d)(3).) Hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of section 872 is inadmissible at the evidentiary hearing, unless made admissible by another exception to the hearsay rule. (§ 1170.95, subd. (d)(3).)

"We independently review a trial court's determination on whether a petitioner has made a prima facie showing. [Citation.]" (*Harden*, *supra*, 76 Cal.App.5th at p. 270.) When the trial court applies its factual findings under a statute, we review the factual findings for substantial evidence. (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1086-1087.) However, the interpretation and application of the statute to those factual findings is a question of law subject to de novo review. (*People v. Johnson* (2016) 1 Cal.App.5th 953, 960.)

In this case, the jury was not instructed on felony murder, the natural and probable consequences doctrine, or any other theory of liability that would have permitted the jury to impute malice to Omar. At trial, the prosecution argued two theories of murder liability, namely that Omar (and his brother Jonathan) committed murder as either direct perpetrators or direct aiders and abettors.

In closing argument, the prosecutor explicitly stated that Omar and his brother were being charged with not just malice aforethought murder, which required that the killing have been done "with either express or implied malice aforethought," but premeditated murder, which required willfulness, deliberation, and premeditation. The

12

prosecutor also argued in detail how the evidence in this case, which demonstrated that Omar and his brother both participated in a brutal beating, kicking, and killing of a 72-year-old man as he lay helpless on a bar floor, proved that they both had committed willful, deliberate and premeditated murder. The prosecution, in relevant part, stated: "We have laws that provide for this type of situation, and that means that both of them are going to be responsible for the acts they commit together, and that's the aider and abettor law, and the judge is going to read this law to you and the instruction so you will understand that when a person is an aider and abettor - equally guilty. So you don't even have to worry about that problem. [¶] All they have to know is that it's unlawful. They have the intent of either committing, encouraging, assisting, facilitating in the commission of that crime, and I don't think that we're going to have an argument there; by act, advice, aiding, promoting, encouraging, instigating. One could have stood there and said do it, just go. Go for it. You're in. When you buy that, you're in. Our society says we will not allow that. [¶] They're responsible for all *natural and probable consequences*."

In response, defense counsel asserted that Omar was drunk at the time of the killing and for that reason did not possess premeditation, express malice, or even implied malice, making him guilty of involuntary manslaughter at most. Consistent with this argument, the trial court instructed the jury on voluntary intoxication and involuntary manslaughter.

13

The trial court also instructed the jury on aiding and abetting. This instruction in particular required that the aider and abettor "know[] of the perpetrator's unlawful purpose" and "specifically intend[] to, and [did] in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." The jury was further instructed that, if it found a defendant guilty of murder, then it had to determine whether the murder was of the first or second degree. The jury was also instructed on first degree and second degree murder and that, unless instructed otherwise, "all instructions apply to each defendant." The jury found both Omar and Jonathan guilty of first degree murder. In other words, the jury rejected defense's theory of the case and found that each defendant committed the murder with premeditation, as either a direct perpetrator or a direct aider and abettor.

Although the prosecutor used the term "natural and probable consequences" in closing argument and the court's instruction on implied malice and second degree murder contained natural and probable consequences language, which could be similar to the natural and probable consequences doctrine, these are two "distinctly different concepts." (*People v. Soto*, *supra*, 51 Cal.App.5th at p. 1056; accord, *People v. Chiu* (2014) 59 Cal.4th 155, 158, abrogated on another ground by Sen. Bill No. 1437 (2017-2018 Reg. Sess.).) The "natural consequences" language in instructions "does not transform [a petitioner's] conviction into one for murder under the natural and probable consequences doctrine within the meaning of section 1170.95." (*People v. Soto*, *supra*, at p. 1059.)

A direct aider and abettor to murder must at least share the mens rea of the actual perpetrator, i.e., express or implied malice. (*People v. Soto*, *supra*, 51 Cal.App.5th at p. 1057.) "For implied malice murder, [the requisite] intent is that the perpetrator '"knows that his conduct endangers the life of another and . . . acts with conscious disregard for life."' [Citation.] The 'physical component' required for implied malice murder 'is satisfied by the performance of "an act, the natural consequences of which are dangerous to life."'" (*Id*. at p. 1058.) In contrast, an accomplice whose liability for murder is premised on the natural and probable consequences doctrine "need only intend to aid a different, less serious 'target' crime," the natural and probable consequence of which is murder. (*Id*. at p. 1057.) Here, the jury was not instructed on the natural and probable consequence doctrine or any target crime upon which murder based on a natural and probable consequences theory could be predicated. (See *People v. Daniel*, *supra*, 57 Cal.App.5th at p. 677 [defendant ineligible for relief where jury was not instructed on felony murder or natural and probable consequences doctrine]; *People v. Mancilla* (2021) 67 Cal.App.5th 854, 866-867 [conviction based on actual malice under provocative act theory].) Omar was therefore necessarily convicted under a still-valid theory. (See *People v. Powell* (2021) 63 Cal.App.5th 689, 714 [rejecting the defendant's contention that direct aiding and abetting implied malice murder is an invalid legal theory].)

Because Omar was not convicted of felony murder or murder under a natural and probable consequences or other imputed malice theory, he is ineligible for resentencing

as a matter of law.  We therefore conclude the trial court did not err in denying Omar's petition for resentencing.

## IV.

## DISPOSITION

The order denying the petition for resentencing is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
        Acting P. J.

MILLER
        J.